# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

*West American Insurance Co. v. Midwest Open MRI, Inc.*, 2013 IL App (1st) 121034

---

| | |
|---|---|
| Appellate Court Caption | WEST AMERICAN INSURANCE CO., Plaintiff and Counterdefendant-Appellee, v. MIDWEST OPEN MRI, INC., Defendant and Counterplaintiff-Appellant. |
| District & No. | First District, Second Division<br>Docket No. 1-12-1034 |
| Filed | April 16, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Judgment on the pleadings was properly entered for plaintiff insurer in its action seeking a declaration that it had no duty to defend or indemnify defendant in an underlying action alleging that defendant was engaged in "kickback" schemes under which defendant paid physicians for referring patients to defendant for MRI services, since the underlying complaints did not fall within the scope of the policy plaintiff issued to defendant. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 09-CH-26140; the Hon. Lee Preston, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on
Appeal

John L. Leonard and Michael H. Erdman, both of Teeple Leonard & Erdman, of Chicago, for appellant.

Joshua G. Vincent and Cecilia A. Horan, both of Hinshaw & Culbertson LLP, of Chicago, for appellee.

Panel

JUSTICE CONNORS delivered the judgment of the court, with opinion.
Presiding Justice Harris and Justice Quinn concurred in the judgment and opinion.

## OPINION

¶ 1    This appeal arises out of a dispute over whether an insurer, West American Insurance Company, owed its insured, Midwest Open MRI, a duty to defend or indemnify in a lawsuit brought against Midwest by one of its competitors. West American filed a declaratory judgment action seeking a declaration that it had no duty to defend or indemnify Midwest in the underlying lawsuit and Midwest filed a counterclaim seeking a declaration of coverage. The parties filed cross-motions for judgment on the pleadings. The circuit court granted West American's motion and denied Midwest's motion, finding that: (1) the underlying claim alleged an economic loss that was not covered under the policy; (2) the underlying lawsuit contained no discrimination claims; and (3) West American was not estopped from raising defenses to coverage. Following Midwest's timely appeal of the judgment, we affirm.

¶ 2                        BACKGROUND

¶ 3    Midwest provides magnetic resonance imaging (MRI) services to patients. It was sued by one of its competitors, Advanced Physicians, for allegedly violating section 2 of the Illinois Consumer Fraud and Deceptive Business Practices Act (Consumer Fraud Act) (815 ILCS 505/2 (West 2010)). Advanced Physicians and its principals, Richard and Dana Vallandigham, filed a series of amended complaints which, for the purposes of this appeal, are all substantially similar in their allegations.[1] The following allegations are taken from

---

[1]Richard and Dana Vallandigham, in their individual capacities, initially filed suit against Midwest and a number of other MRI facilities, jointly. Vallandigham v. Future Diagnostic Group, LLC, No. 07 CH 13689 (Cir. Ct. Cook Co.). The Vallandighams were found to have improperly joined the defendants and later refiled their claims against Midwest and others separately in new actions. See Vallandigham v. Midwest Open MRI, Inc., No. 09 CH 24155 (Cir. Ct. Cook Co.). They amended their complaint to substitute Advanced Physicians as plaintiff. Advanced Physicians subsequently amended the substance of its complaint several times.

Advanced Physicians' verified fourth amended complaint, the last complaint filed.

¶ 4    Generally, Advanced Physicians alleged that Midwest engaged in "widespread solicitation and conspiracy to engage in kickback[-]for[-]referral arrangements" with certain physicians or clinics and submitted false and deceptive billing records to patients and third-party payors. Advanced Physicians claimed that it has been "restrained from capturing much of the outside MRI business in [the region] *** because a substantial part of that market has been and is being illegally monopolized by [Midwest]" in conspiracy with those referring physicians and clinics.

¶ 5    Specifically, Advanced Physicians alleged that Midwest contracts with certain physicians who refer patients to it for MRI scans, and in return, these referring physicians share in the medical billing revenues. The alleged scheme is conducted in one of two ways. In the first scenario, a physician would refer a patient to Midwest's facility. Midwest's technicians would perform MRI scans on the referred patients and its radiologists would read the MRI studies as well. Midwest would forego billing the patients and their insurers for the costs of performing these procedures and instead allow the referring physicians to bill for and collect those payments, even though the physicians did not perform those services. In exchange, the referring physician allegedly would pay Midwest $350 to $450 for each scan, which is "well below the usual and customary charge," and call the payment a "lease payment or equipment rental" fee. According to Advanced Physicians, this practice guaranteed Midwest "a substantial contracted stream of referred patients."

¶ 6    In the second scenario, Advanced Physicians again alleged that Midwest would perform the MRI scans on patients referred to it by a referring physician. But in this scenario, Midwest would bill the patients and their insurers the usual and customary fee for MRI services and collect those fees directly. Midwest then would pay the referring physician approximately $450 per referral, often pursuant to the terms of a written management services agreement. Significantly, Advanced Physicians alleged that under these referral arrangements, the amount Midwest collected from referring physicians for performing these services was "designed to price other non-participating MRI facilities out of the market or drastically reduce competition in the diagnostic testing market," which constitutes a "predatory pricing scheme[ ] *** used to monopolize the pool of [r]eferring [p]hysicians" in the region.

¶ 7    Dr. Richard Vallandigham, the principal of Advanced Physicians, discovered this alleged scheme in 2005, when he began marketing his new "state of the art" MRI facility to local physicians in an effort to obtain business. He claimed that many of the physicians he met told him that they had contractual referral agreements with Midwest, "pursuant to which they received compensation for referred MRI scans and for which they did no work." Consequently, the physicians declined to refer patients to Advanced Physicians. Vallandigham was advised that this contractual referral system among physicians and Midwest, among others, was the "usual and customary procedure in the industry."

¶ 8    Vallandigham was also told that these physicians entered into "sham lease agreements" with Midwest, which purported to show that physicians leased space at Midwest to attend to their patients, although they did not in fact see any patients at Midwest's facility. The

"sham lease agreements" allowed Midwest and the physicians to submit false billings to patients and their insurers. Vallandigham alleged that he had a telephone conversation with Dr. Niranjana Giri, president and chief executive officer of Midwest, during which Dr. Giri allegedly admitted that she participated in the referral arrangements and lease agreement schemes with the referring physicians. Dr. Giri agreed to meet with Vallandigham to discuss the details of these schemes with him, but the meeting never occurred.

¶ 9    As a result of these arrangements between Midwest and the referring physicians, Midwest is believed to perform 300 to 400 scans per month at the below-market contracted rate for services. On the other hand, Advanced Physicians claimed it charged its patients the usual and customary rate but performed less than half as many scans, despite its capacity to perform 750 scans per month. Furthermore, of its 145 monthly scans, only 20 of them resulted from "open market referrals." Advanced Physicians alleged that Midwest's "wrongful conduct interfere[d] with the market competition, doctor-patient relationships[,] and the public's right to choose their own physician and is a direct impediment to [Advanced Physicians'] ability to provide quality healthcare" in the region.

¶ 10    Advanced Physicians specifically alleged that the physicians' refusal to do business with it is a result of the "contracting conspiracy involving [Midwest] and the [r]eferring [p]hysicians, *** which has operated and continues to operate to deny [Advanced Physicians] access to essential referral sources in order to fairly compete" in this region. Additionally, Midwest has allegedly attained an "overwhelming" share of the market for MRI services through its "predatory price fixing."

¶ 11    Advanced Physicians alleged that Midwest violated section 2 of the Consumer Fraud Act by "knowingly ma[king] its kickback offers to dozens of potential [r]eferring [p]hysicians" and "actually pa[ying]" them for patient referrals. 815 ILCS 505/2 (West 2010). It alleged that Midwest "has cultivated a business practice of inducing, conspiring[,] and rewarding fraud in order to increase business, limit competition[,] and/or drive entities like [Advanced Physicians] out of business." It further alleged that Midwest has "solicited and accomplished widespread fraud in the diagnostic imaging marketplace, harming *** competitors such as [Advanced Physicians] as it is unable to compete because it is unwilling to participate in fraud." Midwest's conduct was alleged to be "willful, intentional, [and] evidence of an evil motive and constitutes reckless indifference to the rights of medical consumers and competitors, including [Advanced Physicians]." As a result of Midwest's actions, Advanced Physicians alleged that it "suffered and continues to suffer substantial monetary damages." Advanced Physicians sought the following relief: a declaration that Midwest's conduct violated the Consumer Fraud Act, a permanent injunction to prevent Midwest from engaging in the unlawful conduct described, monetary damages and restitution, penalties awarded under the Consumer Fraud Act, and attorney fees.

¶ 12    Midwest tendered each version of the Vallandigham and Advanced Physicians complaints to West American pursuant to the terms of its general liability insurance policy. Shortly after Midwest tendered the first Vallandingham complaint, which included multiple MRI facility defendants to West American, the court determined that the defendants had been improperly joined. The precise disposition of that complaint is unclear from the record and the order itself is not included in the record on appeal. Midwest represented in its filings here

and in the court below that it filed a motion to sever and the court, "by striking the complaint, in fact dismissed the case." However, "[l]eave to amend was allowed but only by the filing of a new case, without joining the other defendants." Nevertheless, West American filed a declaratory judgment action seeking a declaration that it had no duty to defend or indemnify Midwest in the underlying action, but it was filed after the disposition of the first Vallandigham complaint. West American amended its declaratory judgment complaint each time Midwest tendered an amended complaint filed by the Vallandighams or Advanced Physicians in the underlying lawsuits.

¶ 13 West American challenged coverage on several grounds. First, it alleged that the Vallandigham and Advanced Physicians complaints failed to allege an "occurrence" or "Bodily Injury," "Property Damage," or "Personal and Advertising Injury" as defined by the policy. West American also asserted several policy exclusions for intentional and criminal behavior and alleged that the claimed injuries suffered by Advanced Physicians occurred before the effective date of the policy pursuant to the known loss doctrine.

¶ 14 Midwest filed a counterclaim against West American seeking a declaration of coverage, a duty to defend and indemnify Midwest in the underlying actions, and reimbursement for attorney fees already expended in defending against the underlying complaints. Midwest also asserted that West American was estopped from denying that it owed Midwest a duty to defend or indemnify in the underlying action because West American filed its declaratory judgment action after the initial Vallandigham complaint had been dismissed.

¶ 15 The relevant provisions of Midwest's insurance policy are as follows.

"SECTION I - COVERAGES

COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY

1. Insuring Agreement

a. We will pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies. We will have the right and duty to defend the insured against any 'suit' seeking those damages. However, we will have no duty to defend the insured against any 'suit' seeking damages for 'bodily injury' or 'property damage' to which this insurance does not apply. We may, at our discretion, investigate any 'occurrence' and settle any claim or 'suit' that may result.

***

b. This insurance applies to 'bodily injury' or 'property damage' only if:

1. The 'bodily injury' or 'property damage' is caused by an 'occurrence' that takes place in the 'coverage territory';

2. The 'bodily injury' or 'property damage' occurs during the policy period; and

3. Prior to the policy period, no insured *** knew that the 'bodily injury' or 'property damage' had occurred, in whole or in part. If such a listed insured *** knew, prior to the policy period, that the 'bodily injury' or 'property damage' occurred, then any continuation, change or resumption of such 'bodily injury' or

-5-

'property damage' during or after the policy period will be deemed to have been known prior to the policy period.

\*\*\*

2. Exclusions

This insurance does not apply to:

a. Expected Or Intended Injury

'Bodily injury' or 'property damage' expected or intended from the standpoint of the insured.

\*\*\*

COVERAGE B PERSONAL AND ADVERTISING INJURY LIABILITY

1. Insuring Agreement

a. We will pay those sums that the insured becomes legally obligated to pay as damages because of 'personal and advertising injury' to which this insurance applies. We will have the right and duty to defend the insured against any 'suit' seeking those damages. However, we will have no duty to defend the insured against any 'suit' seeking damages for 'personal and advertising injury' to which this insurance does not apply. We may, at our discretion, investigate any offense and settle any claim or 'suit' that may result.

\*\*\*

2. Exclusions

This insurance does not apply to:

a. Knowing Violation Of Rights Of Another

'Personal and advertising injury' caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict 'personal and advertising injury.'

\* \* \*

d. Criminal Acts

'Personal and advertising injury' arising out of a criminal act committed by or at the direction of the insured.

\*\*\*

SECTION V - DEFINITIONS

\* \* \*

13. 'Occurrence' means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

14. 'Personal and advertising injury' means injury \*\*\* arising out of one or more of the following offenses:

\* \* \*

h. Discrimination or humiliation that results in injury to the feelings or reputation of a natural person, but only if such discrimination or humiliation is:

(1) Not done intentionally by or at the direction of:

(a) An insured; or

(b) Any 'executive officer' director, stockholder, partner or member of the insured; and

(2) Not directly or indirectly related to the employment, prospective employment or termination of employment of any person or persons by any insured.

\* \* \*

17. 'Property damage' means:

a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

b. Loss of use of tangible property that is not physically injured.

All such loss of use shall be deemed to occur at the time of the 'occurrence' that caused it."

¶ 16    West American and Midwest filed cross-motions for judgment on their respective pleadings. The circuit court granted West American's motion and denied Midwest's motion, ruling that West American had no duty to defend or indemnify Midwest against any of the underlying complaints. The court concluded that the harm alleged by the Vallandighams and Advanced Physicians did not constitute a "loss of use of tangible property that is not physically injured," as contemplated by the policy; rather, it was an ordinary economic loss that was not covered by Midwest's policy. Furthermore, it found that the underlying complaints did not allege a "personal or advertising injury." Specifically, such coverage only applied to personal injuries to a natural person and, therefore, could not apply to Advanced Physicians. Additionally, the complaints brought by the Vallandighams did not allege any discrimination, as Midwest argued. The court also found that based on these findings, it need not address West American's contention that the allegations in the underlying complaints failed to allege an "occurrence."

¶ 17    The court further found that West American was not estopped from denying coverage even though its declaratory judgment action was filed after the first Vallandigham complaint had been dismissed for improper joinder. The court concluded that although the dismissal was a final order, the dispute had not been finally resolved by "judgment or settlement" such that estoppel should apply because the matter continued under a different civil docket number after being refiled against Midwest as a single defendant. Midwest then filed this timely appeal.

¶ 18                                    ANALYSIS

¶ 19    Midwest appeals from the court's entry of judgment on the pleadings, which we review *de novo. State Bank of Cherry v. CGB Enterprises, Inc.*, 2013 IL 113836, ¶ 65. Like a motion for summary judgment, "[j]udgment on the pleadings is properly granted if the pleadings disclose no genuine issue of material fact and \*\*\* the movant is entitled to judgment as a

matter of law." (Internal quotation marks omitted.) *State Bank of Cherry*, 2013 IL 113836, ¶ 65. In deciding on cross-motions for judgment on the pleadings, the court must accept all well-pleaded facts as set forth in those pleadings and the fair inferences drawn therefrom. *State Bank of Cherry*, 2013 IL 113836, ¶ 65; *L.E. Myers Co. v. Harbor Insurance Co.*, 67 Ill. App. 3d 496, 497 (1978).

¶ 20     Additionally, this appeal concerns whether the insurer has a duty to defend, which involves the construction of an insurance contract. *Pekin Insurance Co. v. Wilson*, 237 Ill. 2d 446, 455 (2010). We apply a *de novo* standard of review to that question as well. *Pekin Insurance Co.*, 237 Ill. 2d at 455. In evaluating an insurer's duty to defend, we first look to the allegations in the underlying complaint and compare them to the relevant provisions of the insurance policy. *Pekin Insurance Co.*, 237 Ill. 2d at 455. If the alleged facts fall within or potentially within the scope of coverage under the insurance policy, the insurer has a duty to defend the insured. *Pekin Insurance Co.*, 237 Ill. 2d at 455.

¶ 21     Midwest's appeal primarily challenges the court's determination that the allegations of the underlying complaint did not allege a "loss of use" as defined by the policy. However, we conclude that the underlying complaint failed to allege an "occurrence" under the terms of the policy. Although the circuit court did not address that contention in its order, it was argued by the parties and we may affirm the trial court's order on any basis supported by the record. *Rodriguez v. Sheriff's Merit Comm'n*, 218 Ill. 2d 342, 357 (2006).

¶ 22     The insurance policy applies to losses caused by property damage only if the property damage is caused by an "occurrence." The policy defines an "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." Although the policy does not define the term "accident," this court has long recognized that for purposes of insurance coverage claims, an accident is " 'an unforseen occurrence, usually *** an undesigned sudden or unexpected event of an inflictive or unfortunate character.' " *State Farm Fire & Casualty Co. v. Young*, 2012 IL App (1st) 103736, ¶ 26 (quoting *Aetna Casualty & Surety Co. v. Freyer*, 89 Ill. App. 3d 617, 619 (1980)). Furthermore, whether an occurrence is an accident depends on " 'whether the *injury* is expected or intended by the insured, not whether the *acts* were performed intentionally.' " (Emphases in original.) *United National Insurance Co. v. Faure Brothers Corp.*, 409 Ill. App. 3d 711, 717 (2011) (quoting *Lyons v. State Farm Fire & Casualty Co.*, 349 Ill. App. 3d 404, 409 (2004)).

¶ 23     Our review of the underlying complaint leads us to the unavoidable conclusion that it does not allege an occurrence because it makes no allegations of accidental conduct or consequences. Advanced Physicians alleged that Midwest engaged in a "conspiracy" with certain physicians to "illegally monopolize" the market for MRI services in south suburban Chicagoland. According to Advanced Physicians, Midwest operated its scheme in one of two ways. Midwest allegedly accepted a below-market flat fee from the referring physicians to conduct MRI scans and allowed the physicians to submit false billings to the patient and his insurer. Advanced Physicians claimed that the fee Midwest collected was "well below the usual and customary charge" for MRI services. Alternatively, Midwest allegedly performed MRI scans and collected full payment from the patient's insurer and then paid the referring physician a kickback. Advanced Physicians alleged that Midwest and the referring physicians

engaged in "predatory pricing schemes" that had the effect of "pric[ing] other non-participating MRI facilities out of the market" and "drastically reducing competition in the diagnostic testing market." Consequently, Midwest has allegedly amassed an "overwhelming" share of the market for MRI services through this scheme and Advanced Physicians has suffered "substantial monetary damages" as a result. Advanced Physicians asserted that Midwest's conduct was "willful, intentional, [and] evidence of an evil motive" that has harmed Advanced Physicians.

¶ 24    Significantly, according to the complaints, Midwest engaged in these schemes with the express purpose of "driv[ing] entities like [Advanced Physicians] out of business." Advanced Physicians and the Vallandighams explicitly and repeatedly alleged that Midwest's fraudulent and deceptive scheme was designed to price other MRI facilities out of the market. According to the complaints, Midwest intended to put its competitors out of business so that it could dominate the diagnostic testing market in the region, which constituted a violation of the Consumer Fraud Act. Thus, the underlying complaints did not allege accidental conduct or consequences and, thus, did not allege an "occurrence" as defined by the policy. See *Young*, 2012 IL App (1st) 103736, ¶ 31; *West Bend Mutual Insurance Co. v. People*, 401 Ill. App. 3d 857, 866 (2010). See also *Steadfast Insurance Co. v. Caremark Rx, Inc.*, 359 Ill. App. 3d 749, 757-61 (2005) (concluding, in the context of a specific policy exclusion, that claims involving price fixing, kickbacks, and conspiracy to control a market allege intentional acts). Accordingly, West American had no duty to defend Midwest on the claims asserted in the underlying actions. Our conclusion on this issue obviates the need to address whether the complaints asserted a "loss of use" claim under the policy.

¶ 25    Midwest also argues that the underlying complaints alleged a discrimination claim that triggered a duty to defend under the personal and advertising injury clause. We disagree. The policy provides coverage for personal injury claims asserting "discrimination or humiliation that results in injury to the feelings or reputation of a natural person," but only if the act was "not done intentionally by or at the direction of an insured." Furthermore, the policy specifically excludes coverage for " 'personal and advertising injury' caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict 'personal and advertising injury.' "

¶ 26    First, because Advanced Physicians is a corporate entity and not a natural person, the complaints filed by it cannot trigger coverage under the policy. As to the Vallandigham complaints, there are simply no facts alleged therein to bring them within personal injury coverage. Despite Midwest's claims to the contrary, there are no allegations of discrimination contained in the complaints. The Vallandigham complaints allege price fixing, restraints on trade, interference with market competition, and interference with business interests generally. They make no allusions to discrimination against or reputational harm suffered by the Vallandighams. We decline to accept Midwest's interpretation that because some of the referring physicians refused to allow the Vallandighams to leave promotional literature at their offices, the Vallandighams were the target of discrimination. Thus, none of the complaints allege a personal injury that triggers coverage under the policy.

¶ 27    Finally, Midwest argues that West American was estopped from denying coverage because it filed its declaratory judgment action after the disposition of the first Vallandigham

complaint. Generally, the estoppel doctrine provides that "an insurer which takes the position that a complaint potentially alleging coverage is not covered under a policy that includes a duty to defend may not simply refuse to defend the insured." *Employers Insurance of Wausau v. Ehlco Liquidating Trust*, 186 Ill. 2d 127, 150 (1999). Rather, the insurer must either defend the suit under a reservation of rights or seek a declaration that there is no coverage. *Ehlco*, 186 Ill. 2d at 150. If the insurer fails to do either, and is later found to have wrongfully denied coverage, the insurer is estopped from raising policy defenses to coverage. *Ehlco*, 186 Ill. 2d at 150-51. However, the estoppel doctrine only applies where an insurer has breached its duty to defend. *Ehlco*, 186 Ill. 2d at 150-51. Where the insurer has no duty to defend because there was no coverage or potential for coverage under the policy, we will not apply the estoppel doctrine. *Ehlco*, 186 Ill. 2d at 150-51; *United National Insurance Co. v. 200 North Dearborn Partnership*, 2012 IL App (1st) 100569, ¶ 19. Thus, whether estoppel applies necessarily depends on whether the insurer had and breached a duty to defend. *United National Insurance*, 2012 IL App (1st) 100569, ¶ 19.

¶ 28    As we have discussed, the underlying complaints do not contain allegations that bring it within the scope of the policy and West American did not have a duty to defend. Thus, the estoppel doctrine does not prevent West American from asserting policy defenses to coverage in this case. *Ehlco*, 186 Ill. 2d at 150-51; *Steadfast Insurance Co.*, 359 Ill. App. 3d at 761 ("[b]ecause we have concluded that [the insurer] owes no duty to defend [the insured] in the underlying actions, the doctrine of estoppel is inapplicable").

¶ 29    For all of the foregoing reasons, we affirm the judgment of the circuit court.

¶ 30    Affirmed.