# Illinois Official Reports

## Appellate Court

---

### *Margulis v. BCS Insurance Co.*, 2014 IL App (1st) 140286

---

| | |
|---|---|
| Appellate Court Caption | SCOTT MARGULIS, Individually and as the Representative of a Certified Class of Similarly Situated Persons, Plaintiff-Appellant, v. BCS INSURANCE COMPANY, Defendant-Appellee. |
| District & No. | First District, Fourth Division<br>Docket No. 1-14-0286 |
| Filed | November 26, 2014 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In an underlying class action against defendant's insured, plaintiff recovered a judgment for nearly $5 million based on allegations that the insured had transmitted unsolicited automated telephone calls advertising its services that violated the Telephone Consumer Protection Act, but when plaintiff attempted to collect the judgment from defendant pursuant to a settlement agreement providing that the judgment would be satisfied only by the proceeds of the professional liability policies defendant issued to the insurance agents who were defendants in the underlying action, the trial court properly granted defendant insurer's motion for summary judgment and denied plaintiff's motion for summary judgment, since the advertising calls at issue were not negligent acts, errors or omissions arising out of the insured's business of "rendering services for others" as a licensed insurance agent, general agent or broker, as required by the relevant policy, no potential for coverage existed, and defendant had no duty to defend or indemnify. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 11-CH-32712; the Hon. Rita M. Novak, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on
Appeal

Brian J. Wanca, David M. Oppenheim, and Jeffrey A. Berman, all of Anderson & Wanca, of Rolling Meadows, and Phillip A. Bock and Robert M. Hatch, both of Bock & Hatch, LLC, of Chicago, for appellant.

Thomas A. Brusstar and Peter J. Preston, both of Hinkhouse Williams Walsh LLP, of Chicago, for appellee.

Panel

JUSTICE EPSTEIN delivered the judgment of the court, with opinion. Justices Howse and Taylor concurred in the judgment and opinion.

## OPINION

¶ 1    Scott Margulis, individually and on behalf of a class of similarly situated individuals, filed a class action petition in Missouri against "Bradford E. Dixon d/b/a Bradford & Associates a/k/a Bradford and Associates" (Bradford), an insurance agent and/or broker that had transmitted unsolicited, automated telephone calls advertising its services. The lawsuit alleged common law invasion of privacy and violation of a federal statute that restricts telephone solicitations. Bradford's professional liability insurer, BCS Insurance Company (BCS), declined coverage and did not defend Bradford in the action. With the approval of the Missouri court, Margulis and Bradford settled for $4,999,999, with such judgment amount to be satisfied exclusively from the proceeds of the insurance policies and claims against Bradford's insurer(s). Margulis then filed a declaratory judgment action in the circuit court of Cook County against BCS,[1] seeking an order declaring that BCS had a duty to defend Bradford in the underlying action and requiring BCS to pay the judgment amount. The circuit court granted BCS's motion for summary judgment and denied Margulis's motion for summary judgment. Margulis appeals.

¶ 2    We agree with the circuit court that the automated telephone calls at issue did not constitute negligent acts, errors or omissions by Bradford arising out of the conduct of Bradford's business in "rendering services for others" as a licensed insurance agent, general agent or broker, as required for coverage under the BCS policy. Because there was no potential for coverage of Margulis's claims, BCS had no duty to defend or indemnify. We thus affirm the judgment of the circuit court.

---

[1]In its answer to the complaint in the declaratory judgment action, BCS denied that its principal place of business was in Chicago, Illinois, but admitted that it is licensed to conduct business in Illinois. BCS has not contested jurisdiction or venue.

## I. BACKGROUND

On February 14, 2008, Margulis, on behalf of himself and "all other persons similarly situated," filed a class action petition in the circuit court of St. Louis County, Missouri, against Bradford, assigned case number 08SL-CC00670. Margulis alleged that Bradford engaged in a "practice of transmitting unsolicited pre-recorded telephone calls to residential telephone lines advertising its insurance services."

Count I of the petition alleged violation of the Telephone Consumer Protection Act (the TCPA), a federal statute that makes it unlawful "to initiate any telephone call to any residential telephone line using an artificial or prerecorded voice to deliver a message without the prior express consent of the called party, unless the call is initiated for emergency purposes" or is exempted by rule or order by the Federal Communications Commission (FCC). 47 U.S.C. § 227(b)(1)(B) (2006). According to the petition, "[c]alls made for a commercial purpose which include or introduce an unsolicited advertisement or constitute a telephone solicitation are expressly excluded from the exemptions adopted by the FCC." Margulis sought statutory damages of $500 per violation. 47 U.S.C. § 227(b)(3)(B) (2006). Count II of the petition alleged common law invasion of privacy; Margulis sought a "fair and reasonable amount of damages for each violation."

BCS issued a "claims made" insurance policy to the "Agents of Blue Cross Blue Shield of Missouri and RightCHOICE Managed Care, Inc., d/b/a Alliance Blue Cross Blue Shield." The parties agree that Bradford was an insured under the policy. The declarations page is entitled, "INSURANCE COMPANY COVERAGE FOR INSURANCE AGENTS AND BROKERS PROFESSIONAL LIABLITY." Section I of the policy provides:

> "**COVERAGE.** The Company does hereby agree to pay on behalf of the Insured such loss in excess of the applicable deductible and within the limit specified in the Declarations sustained by the Insured by reason of the liability imposed by law for damages caused by any negligent act, error or omission by the Insured arising out of the conduct of the business of the Insured in rendering services for others as a licensed Life, Accident and Health Insurance Agent, a licensed Life, Accident and Health Insurance General Agent or a licensed Life, Accident and Health Insurer Broker as respects claims first made against the Insured and reported to the Company during the policy period, while there is in effect a contract between the Plan and the Insured."

"[I]njury to or destruction of any property, including loss of use thereof," is one of the policy exclusions. The policy provided for a limit of $1 million per claim, with an annual aggregate limit of $1 million. The initial policy period was from April 1, 1999 to April 1, 2000 and was renewed; the parties agree that the policy was in effect between April 1, 2007 and April 1, 2008.

In a letter dated May 6, 2008, counsel to BCS stated that the company declined coverage. Specifically, the letter provided that "[o]ur analysis of the applicable law shows that the solicitation of business by advertising and marketing directed to members of the general public with whom one has no established business relationship does not involve the provision of services for others as licensed life, accident and health insurance agent." BCS's counsel further stated that "the alleged transmission of unsolicited prerecorded telephone messages appears to involve actions that are intentional as opposed to negligent in nature and the policy limits coverage to actions that are negligent in nature." The letter also referenced various policy exclusions "which may provide independent bases to bar or limit coverage." BCS's counsel

suggested that Bradford may wish to notify its comprehensive general liability (CGL) insurer "as the allegations in the Petition may fall within the express terms of the coverage provided by that policy as either advertising injury and/or as property damage (including the loss of use thereof), or both."

¶ 8    On July 22, 2011, the Missouri court entered a "Final Approval of Settlement Agreement and Judgment," approving a settlement between Margulis, on behalf of himself and the "Class," and Bradford. The class was defined as the "end users of telephone numbers in the (314) and (636) area codes that were (1) identified in Defendant's prerecorded messaging call log record, (2) included in the Missouri No Call database and/or the National Do Not Call Registry, and (3) were sent a prerecorded telephone message advertising the insurance services of Bradford Dixon between November 15, 2006 and February 4, 2008." Bradford transmitted 921,894 prerecorded calls to 186,711 unique telephone numbers.[2] The settlement order provided, among other things, that (a) Bradford did not "willfully, knowingly, or intentionally violate" the TCPA, (b) Bradford "tendered the defense of this suit to his insurer and his insurer declined to defend or indemnify," and (c) judgment was entered against Bradford and in favor of Margulis and the other class members in the total amount of $4,999,999 on count I of the class action petition, "said judgment to be satisfied only from the proceeds of the insurance policies and claims against Defendant's insurer(s)."

¶ 9    On September 19, 2011, Margulis, on behalf of himself and the other class members, filed a declaratory judgment action in the circuit court of Cook County against BCS, seeking an order declaring that BCS had a duty to defend Bradford in the Missouri action and "[d]eclaring and ordering that BCS Insurance is required to indemnify and pay the judgment entered therein against Bradford."

¶ 10    In its answer, BCS denied any duty to defend or indemnify Bradford. Bradford also asserted affirmative defenses, including that: (a) Bradford did not obtain the written agreement of BCS prior to entering the settlement agreement, in violation of the insurance policy, and thus Margulis lacked standing; (b) Bradford did not notify BCS of the claims prior to the end of the policy period; and (c) given that Bradford's acts as alleged in the Missouri class action petition were intentional and were not performed while Bradford was rendering services for others, "Bradford's claim for defense and indemnity resulting from the underlying suit is not covered because it does not fall within the Policy's insurance agreement."

¶ 11    BCS and Margulis each filed motions for summary judgment pursuant to section 2-1005 of the Illinois Code of Civil Procedure (the Code) (735 ILCS 5/2-1005 (West 2010)). At the time that the circuit court took the parties' cross-motions for summary judgment under advisement, the Illinois Supreme Court was reviewing an appellate court ruling that the statutory damages under the TCPA are punitive and uninsurable as a matter of law. *Standard Mutual Insurance Co. v. Lay*, 2012 IL App (4th) 110527. After our supreme court reversed that portion of the appellate court's decision (*Standard Mutual Insurance Co. v. Lay*, 2013 IL 114617, ¶¶ 23-34), the circuit court directed BCS and Margulis to file renewed motions for summary judgment.

---

[2]The settlement order states that Bradford "purchased a list of telephone numbers from a third party marketing company, Infinity Marketing, and [Bradford] ran the list of telephone numbers through the No Call list to eliminate any numbers on the No Call list prior to directing the prerecorded messages to be sent."

¶ 12    In support of his renewed motion for summary judgment, Margulis argued that BCS breached its duty to defend Bradford and that, based on such breach, BCS "is estopped from raising coverage defenses." Margulis sought indemnification of the underlying judgment–which substantially exceeded the policy limits–plus postjudgment interest. BCS claimed that "nothing about the TCPA violations alleged against [Bradford] involved rendering professional services to others as an insurance agent. The substance of [Bradford's] actions are nothing more than the advertising function of any business, which [Bradford] directed to strangers." BCS asserted that because there was no possibility of coverage under the professional liability policy, it properly declined to defend or indemnify.

¶ 13    In a memorandum decision and order entered on December 19, 2013, the circuit court granted BCS's summary judgment motion and denied Margulis's motion. The court concluded that, applying Illinois or Missouri law, BCS had no duty to defend or indemnify because the claims asserted in the underlying class action petition would not be covered by the BCS policy. Given that "there was no possibility of coverage," the court rejected Margulis's estoppel argument. Margulis filed this appeal.

¶ 14                                    II. ANALYSIS

¶ 15    On appeal, Margulis contends that the circuit court of Cook County "impermissibly construed ambiguous policy language narrowly, rather than broadly, such that the possibility of coverage would be foreclosed." He asks us to "hold that BCS had and breached a duty to defend Bradford in connection with the Underlying Action." According to Margulis, "[w]hen this Court reverses the duty to defend issue, it can and should also conclude that BCS is estopped as a matter of law" and "must indemnify the underlying judgment plus postjudgment interest."

¶ 16    BCS counters that Margulis is "ignoring the key passage" in the policy, *i.e.*, that the action arise out of the conduct of the business of the insured "in rendering services for others." BCS further contends that it "cannot be estopped when it never had a duty to defend." Finally, BCS asserts that even if it was estopped from raising policy defenses, no basis exists for extending BCS's liability beyond the policy limit because "the entire judgment flows from Bradford's own conduct, and neither Bradford nor Margulis claims that Bradford suffered a default judgment or was otherwise left without effective counsel in the underlying action."

¶ 17    We review an order granting a motion for summary judgment *de novo*. *Standard Mutual Insurance Co. v. Lay*, 2013 IL 114617, ¶ 15. Summary judgment is appropriate when "the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2-1005(c) (West 2012).

¶ 18                    A. Duty to Defend and Duty to Indemnify

¶ 19    The fundamental question is whether the BCS breached its duty to defend Bradford in the underlying action. Given that an insurer's duty to defend is broader than its duty to indemnify, if BCS owed no duty to defend, it owes no duty to indemnify. *Crum & Forster Managers Corp. v. Resolution Trust Corp.*, 156 Ill. 2d 384, 398 (1993); *Metzger v. Country Mutual Insurance Co.*, 2013 IL App (2d) 120133, ¶ 19.

¶ 20    Both Margulis and BCS agree that Illinois law applies to this issue.[3] As the Illinois Supreme Court recently stated in *Bridgeview Health Care Center, Ltd. v. State Farm Fire & Casualty Co.*, 2014 IL 116389, a choice-of-law determination is necessary only when the difference in law will make a difference in the outcome. *Id.* ¶ 14. The "party seeking the choice-of-law determination bears the burden of demonstrating a conflict, *i.e.*, that there exists a difference in the law that will make a difference in the outcome." *Id.* As neither party seeks application of the law of another state, *i.e.*, Missouri, we turn our attention to the Illinois law on the duty to defend.

¶ 21                     i. Duty to Defend and Insurance Policy Interpretation

¶ 22    "Courts look to the allegations of the underlying complaint to determine an insurer's duty to defend its insured." *Illinois Emcasco Insurance Co. v. Northwestern National Casualty Co.*, 337 Ill. App. 3d 356, 359 (2003). The insurer has a duty to defend if the complaint alleges facts potentially within policy coverage. *Id.* " 'An insurer may not justifiably refuse to defend an action against its insured unless it is clear from the face of the underlying complaint[ ] that the allegations fail to state facts which bring the case within, or potentially within, the policy's coverage.' " *Id.* (quoting *United States Fidelity & Guaranty Co. v. Wilkin Insulation Co.*, 144 Ill. 2d 64, 73 (1991)). In other words, "an insurer must defend if the insurance contract might possibly cover the alleged source of liability." *Illinois Emcasco*, 337 Ill. App. 3d at 359-60; *L.J. Dodd Construction, Inc. v. Federated Mutual Insurance Co.*, 365 Ill. App. 3d 260, 262 (2006) (noting that "an insurer may justifiably refuse to defend against the underlying action if the complaint clearly does not allege facts potentially within coverage").

¶ 23    "An insurance policy is a contract, and the general rules governing the interpretation of other types of contracts also govern the interpretation of insurance policies." *Hobbs v. Hartford Insurance Co. of the Midwest*, 214 Ill. 2d 11, 17 (2005). "Accordingly, our primary objective is to ascertain and give effect to the intention of the parties, as expressed in the policy language." *Id.* "If the policy language is unambiguous, the policy will be applied as written, unless it contravenes public policy." *Id.*

¶ 24    "Whether an ambiguity exists turns on whether the policy language is subject to more than one reasonable interpretation." *Hobbs*, 214 Ill. 2d at 17. "Although 'creative possibilities' may be suggested, only reasonable interpretations will be considered. [Citation.]" *Id.* Simply put, we will not "strain to find an ambiguity where none exists." *Id.* "Although policy terms that limit an insurer's liability will be liberally construed in favor of coverage, this rule of construction only comes into play when the policy is ambiguous." *Id.*; *American Country Insurance Co. v. James McHugh Construction Co.*, 344 Ill. App. 3d 960, 970 (2003) (noting that rules of construction such as liberally construing allegations in a complaint in favor of an insured "do not justify construing a contract against an insurer where no real ambiguity exists").

---

[3]To the extent that there may be an "outcome-determinative conflict" between Illinois and Missouri law, Margulis seeks application of Missouri law on the question of whether the estoppel doctrine could impose liability beyond the policy limits. As discussed herein, we need not examine the scope or application of the estoppel doctrine given our conclusion that BCS did not breach its duty to defend.

¶ 25            ii. The Margulis Class Action Petition and the BCS Policy

¶ 26       Margulis's class action petition, *i.e.*, the complaint, alleged, in part, that Bradford "developed a promotional scheme utilizing a pre-recorded message sent to telephone lines including residential telephone line subscribers like Plaintiff" and the "purpose of the scheme was to advertise [Bradford's] insurance services." Margulis asserted in the petition that Bradford's actions violated the right to privacy afforded Margulis and the other class members. Subject to the various limitations and exclusions stated in the policy, Bradford's policy with BCS provided coverage for "loss *** by [Bradford] by reason of liability imposed by law for damages caused by any negligent act, error or omission by [Bradford] arising out of the conduct of the business of [Bradford] in rendering services for others as a licensed Life, Accident and Health Insurance Agent, a licensed Life, Accident and Health Insurance General Agent, and a licensed Life, Accident and Health Insurance Broker."

¶ 27       Observing that Bradford's "advertising calls sought to induce the recipients to use Bradford's specialized services as an insurance agent or broker," Margulis contends on appeal that "[i]t does not take much effort to move from there to the conclusion that the resulting injuries arose out of Bradford's business, such that at least a potential for coverage, and therefore, a duty to defend exists." Margulis also asserts that the " 'arising out of the conduct of the business of the insured in rendering services for others as [an insurance agent or broker]' limiting language, on which BCS bases its denial of coverage, is neither definite nor specific." Claiming that it is "impossible to reconcile an express grant of coverage for a specific type of activity by an insurer with the insurer's subsequent denial that such activity can ever be covered," Margulis argues that the policy language is ambiguous and should be construed in favor of coverage.

¶ 28       Comparing the class action petition against Bradford and the BCS policy, we do not read the allegations in the petition as falling within the potential scope of the policy's coverage because the allegedly negligent acts, errors or omissions–the transmission of automated, unsolicited telephone calls advertising Bradford's services–did not arise out of the conduct of Bradford's business *in rendering services for others* as an insurance agent, general agent or broker. We do not agree with Margulis that "all that the BCS Policy requires" is "a negligent act arising out of the conduct of Bradford's insurance agency business." Such interpretation effectively deletes the "rendering services for others" language. We will not interpret a policy in a manner that renders provisions of the policy meaningless. *Cincinnati Insurance Co. v. Gateway Construction Co.*, 372 Ill. App. 3d 148, 152 (2007). Conversely, Margulis repeatedly references the "substantial nexus" between Bradford's telemarketing activity and its business as an insurance agent, but the BCS policy does not mention or require any "nexus." We will not read into the policy language any additional terms. See *Barth v. State Farm Fire & Casualty Co.*, 228 Ill. 2d 163, 174-75 (2008).

¶ 29       Margulis asserts that "Bradford's calls provided information that it believed would be useful to insurance clients or offered to provide information and assistance to the buyers of insurance to construct insurance based protection for their specific businesses." According to Margulis, "[t]here is little else that would comprise professional services offered by an insurance agent or broker." We disagree. As BCS suggests, "[a]ny of the following could constitute the rendering of professional services by an agent or broker: Meeting with clients to discuss their insurance needs; counseling clients on the products best-suited to those needs; obtaining competing bids from insurance companies; completing insurance applications with

clients; procuring coverage; and renewing, cancelling, or consulting about premium charges." BCS observes, and we agree, that a "client counseled badly in any of those areas could bring a malpractice suit against Bradford, which would be potentially covered by the BCS policy." Margulis's assertion that "Bradford's calls provided information that it believed would be useful to insurance clients" overlooks the fact that, according to the class action petition, there was no "established business relationship" between Bradford and the members of the proposed class, including Margulis. Simply put, the recipients of Bradford's robocalls were, based on our review of the petition, *not* insurance clients of Bradford. Therefore, we conclude that the calls did not constitute a "negligent act, error or omission by [Bradford] arising out of the conduct of the business of [Bradford] in rendering services for others as" a licensed insurance agent, general agent or broker. Bradford was not rendering services for the call recipients as an agent or broker where, as here, the recipients were not Bradford's clients or customers.

¶ 30    As noted above, "[w]here an ambiguity in an insurance policy is found, we will construe it in favor of the insured." *Hobbs*, 214 Ill. 2d at 30-31. However, we will not " 'torture ordinary words until they confess to ambiguity.' " *Id.* at 31 (quoting *Western States Insurance Co. v. Wisconsin Wholesale Tire, Inc.*, 184 F.3d 699, 702 (7th Cir. 1999)). We conclude that Bradford's policy with BCS is not ambiguous and does not provide coverage for the claims asserted by Margulis in the class action petition.

¶ 31                              iii. *Westport* and *Landmark* Decisions

¶ 32    *Westport Insurance Corp. v. Jackson National Life Insurance Co.*, 387 Ill. App. 3d 408 (2008), an Illinois Appellate Court decision addressing professional liability insurance coverage and TCPA claims, strongly supports our conclusion. Margulis urges us to rely on *Landmark American Insurance Co. v. NIP Group, Inc.*, 2011 IL App (1st) 101155, another appellate decision involving TCPA claims and professional liability insurance coverage. As discussed below, we agree with the circuit court that "[t]his case is closer to *Westport* than *Landmark*" and that the "policy language in *Landmark* is distinguishable from the instant case and was the linchpin for the Appellate Court's holding."

¶ 33    In *Westport*, a class action lawsuit was filed against an insurance agency alleging that its transmission of unsolicited faxes advertising group health insurance violated federal law. *Westport*, 387 Ill. App. 3d at 409-10. The parties entered into an agreed order settling the action for $2 million in favor of the plaintiff class; the insurance agency assigned the class all of its rights to indemnity from its insurers, including Westport Insurance Corporation (Westport). The Westport policy was entitled "Insurance Company Coverage for Insurance Agents and Brokers Professional Liability" and provided, in pertinent part:

> "[Westport] agrees to pay on behalf of the Insured such loss *** sustained by the Insured by reason of liability imposed by law for damages caused by any negligent act, error or omission by the insured agent or for damages caused by libel or slander or invasion of privacy by the insured agent, arising out of the conduct of the business of the insured agent in rendering services for others as a licensed life, accident and health insurance agent, a licensed life, accident and health insurance general agent or a licensed life, accident and health insurance broker while there is in effect a contract between the Named Insured and the licensed insured agent." (Internal quotation marks omitted.) *Id.* at 410.

Affirming the circuit court's grant of summary judgment in favor of Westport, the appellate court noted that the title of the policy "clearly indicates that the policy provides coverage for 'professional liability.' " *Id.* at 412. "Although it may not be an operative term of the policy," the court reasoned that "the title clearly indicates the type of insurance" that was purchased. *Id.* The court thus read the phrase, "rendering services for others as a licensed life, accident and health insurance agent, a licensed life, accident and health insurance general agent or a licensed life, accident and health insurance broker," to signify the "agent or broker's *professional* services." (Emphasis in original and internal quotation marks omitted.) *Id.* Because the insurance agency's faxed advertisement was "merely an overture to potential customers," coverage under the policy did not extend to the asserted claims. *Id.* at 414. The court concluded:

> "Even if [the class representative] is correct that the delivery of this general information was an 'act of assistance' and thus, in very broad terms, 'a service,' it did not amount to rendering a service *as an insurance professional* within the contemplation of the policy. No expertise was employed to help a particular customer purchase a particular product. The mere offer to perform a professional service is not a professional service in its own right." (Emphasis in original.) *Id.*

¶ 34 The policy at issue in *Westport* is similar to the BCS policy. The two policies are identically named: "Insurance Company Coverage for Insurance Agents and Brokers Professional Liability." Such a title, while not dispositive, indicates the parties' intent that the policy would cover professional services. As the *Westport* court observed, "the type of insurance purchased is germane to determining the meaning of policy language." *Id.* at 412. Like the faxes in *Westport*, the robocalls by Bradford were "merely an overture to potential customers" and "did not amount to rendering a service *as an insurance professional* within the contemplation of the policy." (Emphasis in original.) *Id.* at 414. The BCS policy deductibles of "$1,000.00 each claim Blue Cross Blue Shield policies" and "$2,500.00 each claim on other life and health insurance policies & mutual funds" further indicate that claims must arise from arise from professional services relating to particular policies and funds, as opposed to marketing efforts directed to strangers. If anything, the policy language in *Westport* included "damages caused by libel or slander or *invasion of privacy* by the insured agent" (emphasis added), and thus was broader than the language in the BCS policy, yet the *Westport* court found no coverage.

¶ 35 Margulis contends that the circuit court's reliance on *Westport* was "misplaced," and instead urges us to rely on *Landmark American Insurance Co. v. NIP Group, Inc.*, 2011 IL App (1st) 101155. In that case, the insurer (Landmark) sought a declaration that it had no obligation to defend or indemnify NIP Group, Inc. (NIP), in a class action lawsuit relating to NIP's alleged practice of faxing unsolicited advertisements. *Id.* ¶ 1. The complaint alleged common law conversion and violations of the TCPA and the Illinois Consumer Fraud and Deceptive Business Practices Act (the Consumer Fraud Act) (815 ILCS 505/2 (West 2008)). *Landmark*, 2011 IL App (1st) 101155, ¶ 5. The insurance policy Landmark issued to NIP provided " 'MISCELLANEOUS PROFESSIONAL LIABILITY COVERAGE.' " *Id.* ¶ 6. The policy stated that " '[Landmark] will pay on behalf of the Insured *** all sums that the Insured becomes legally obligated to pay as *Damages* and associated *Claim Expenses* arising out of a negligent act, error or omission, *Advertising Liability* or *Personal Injury*, even if the *Claim* asserted is groundless, false or fraudulent, in the rendering or failure to render professional

services as described in the Declarations ***[.]' " (Emphases in original.) *Id.* The policy excluded claims based on or arising out of " '[f]alse advertising or misrepresentation in advertising, but only regarding intentionally false, misleading, deceptive, fraudulent, or misrepresenting statements in advertising the insured's own product or service.' " *Id.* The policy defined " '*Advertising Liability*' " as injury arising out of, among other things, " '[o]ral or written publication of material that violates a person's right of privacy.' " (Emphasis in original.) *Id.* Included in the endorsements was a list of NIP's professional services which were covered by the policy; the list included NIP's role as an "insurance wholesaler, insurance managing general agent, insurance general agent, insurance underwriting manager, insurance program administrator, insurance agent, insurance broker, surplus lines insurance broker, insurance consultant, insurance claims administrator, insurance appraiser, and insurance premium financier." *Id.* ¶ 7.

¶ 36    The *Landmark* appellate court recognized that "Illinois law views professional liability policies to be limited forms of insurance, which generally provide coverage only for those risks 'inherent' in the insured's professional services." *Id.* ¶ 39 (citing *Crum & Forster Managers Corp. v. Resolution Trust Corp.*, 156 Ill. 2d 384, 392-93 (1993)). The court stated that "Landmark and the circuit court essentially read *Crum & Forster* and *Westport* to establish that sending unsolicited fax advertisements can *never* amount to the provision of professional services under a professional liability policy–despite any possible differences in the specific policy language at issue, the services provided by an insured, or the underlying facts." (Emphasis in original.) *Id*. Characterizing such interpretation as "much too broad," the *Landmark* court, quoting *Westport*, stated that "it is the actual language of a policy that ultimately controls the determination of what risks are covered." (Internal quotation marks omitted.) *Id*. (quoting *Westport*, 387 Ill. App. 3d at 412).

¶ 37    Reversing the circuit court's grant of summary judgment to the insurer, the *Landmark* court analyzed the "significantly different [policy] language" of the *Westport* policy. *Landmark*, 2011 IL App (1st) 101155, ¶ 39. Coverage under the *Westport* policy was "only available for services rendered 'for others' as an insurance agent, general agent, or broker." *Id.* ¶ 40. In *Landmark*, coverage was provided for liability incurred "in the rendering or failure to render professional services," which included NIP's lengthy litany of roles–listed above–that were "left completely undefined by the policy." (Internal quotation marks omitted.) *Id.* The *Landmark* court noted that "whatever the *Westport* decision may have to say about coverage for NIP's role as an insurance agent or broker, that case did not concern professional services such as insurance wholesaler, underwriting manager, program administrator, and insurance consultant." *Id.* The *Landmark* court also stated that, unlike the policy in *Westport*, the "coverage for violation of privacy in this case is specifically included as only one of a number of other covered acts contained in the policy's definition of '*Advertising Liability*,' " including injuries arising out of "[o]ral or written publication of material that slanders or libels a person or organization or disparages a person's organization, products or services" or "[m]isappropriation of advertising ideas or style of doing business." (Emphasis in original and internal quotation marks omitted.) *Id.* ¶ 41. In contrast, the *Westport* decision "includes no indication that the policy in question also contained an exclusion that specifically excluded only certain types of advertising from coverage." *Id*.

¶ 38    We disagree with Margulis's suggestions that the *Landmark* court "rejected both *Westport*'s reasoning and its result" or that the Second District's decision in *Westport* and the

First District's decision in *Landmark* represent a district split, requiring us to follow *Landmark*. Instead, the *Landmark* court properly distinguished *Westport* because, among other things, the *Westport* policy language limited coverage to services rendered for others as an insurance agent, general agent, or broker. The operative language in the instant case is similar to–and, in fact, narrower than–the operative language in *Westport*.[4] The *Landmark* court's discussion of its policy's " 'Advertising Liability' " coverage is not relevant, as Bradford's policy with BCS contains no such coverage. We agree with the circuit court that "Margulis's reliance on *Landmark* is unavailing."

¶ 39      iv. Other Cases Addressing the TCPA and Insurance Coverage

¶ 40      Margulis contends that Illinois courts "have repeatedly held that TCPA claims, like those at issue in the Underlying Action, are covered by liability insurance policies." While we agree that Illinois courts have found insurance coverage for certain TCPA claims, we observe that the policy language at issue in most of those cases–as in *Landmark*–differs significantly from the language in the BCS policy.

¶ 41      For example, in *Valley Forge Insurance Co. v. Swiderski Electronics, Inc.*, 223 Ill. 2d 352 (2006), the insured allegedly sent unsolicited fax advertisements; a class action complaint alleged unlawful conversion of the fax machine toner and paper and violations of the TCPA and the Consumer Fraud Act. *Id.* at 355-56. The insured's commercial general liability (CGL) policy obligated the insurer to defend the insured against any suit seeking damages for "personal and advertising injury," which included injury arising out of "[o]ral or written publication, in any manner, of material that violates a person's right of privacy." (Emphasis and internal quotation marks omitted.) *Id.* at 356. The policy also obligated the insurer to defend the insured against any suit seeking "property damage," which was defined to include "[p]hysical injury to tangible property" and "[l]oss of use of tangible property that is not physically injured." (Internal quotation marks omitted.) *Id.* at 357. The insured's policy with an excess insurer imposed similar obligations. *Id.* After analyzing the policy language, the Illinois Supreme Court concluded that the complaint set forth facts that brought the "lawsuit potentially within the coverage of the policies' 'advertising injury' provision," and thus did not need to consider whether the insurers had a duty to defend under the " 'property damage' " provision. *Id.* at 379. Although we recognize that potential insurance coverage for TCPA claims and related claims is not limited to CGL policies, *i.e.*, *Landmark*, the CGL policy in *Valley Forge* differs from the BCS professional liability policy at issue. Unlike the *Valley Forge* policy, the BCS policy does not mention any coverage for "advertising injury" or similar claims, and the BCS policy expressly excludes "injury to or destruction of any property, including loss of use thereof."

---

[4]We are unmoved by Margulis's contention that the *Westport* court "took a portion of the [*Atlantic Lloyd's Insurance Co. of Texas v. Susman Godfrey, L.L.P.*, 982 S.W.2d 472 (Tex. Ct. App. 1998),] opinion and analysis out of context." The *Westport* court acknowledged that *Atlantic Lloyd's* addressed a professional services exclusion. *Westport*, 387 Ill. App. 3d at 413. The *Westport* court viewed the Texas case as providing a "more useful analogy" than *Crum & Forster Managers Corp. v. Resolution Trust Corp.*, 156 Ill. 2d 384, 392-93 (1993), as well as a "cogent analysis." *Westport*, 387 Ill. App. 3d at 412. We agree with the *Westport* court's assessment.

¶ 42    In *Pekin Insurance Co. v. XData Solutions, Inc.*, 2011 IL App (1st) 102769, the plaintiffs alleged conversion and violations of the TCPA and the Consumer Fraud Act, based on unsolicited fax advertisements. *Id.* ¶¶ 4-5. The insurance policy at issue provided, in part, that it covered an " ' "[a]dvertising injury" caused by an offense committed in the course of advertising your goods, products or services.' " *Id.* ¶ 13. The policy defined " '[a]dvertising injury' " as an " 'injury arising out of one or more of the following offenses' ": " '[o]ral or written publication of material that violates a person's right of privacy.' " *Id.* ¶ 14. The appellate court concluded, among other things, that the TCPA claim "falls within or potentially within the coverage of the policy's 'advertising injury' provision." *Id.* ¶ 15. Again, the BCS policy differs substantially from the *Pekin* policy. Where the *Pekin* policy included coverage for advertising injury, which was defined to include "publication of material that violates a person's right of privacy," the BCS policy has no reference to advertising injury.

¶ 43    In *Insurance Co. of Hanover v. Shelborne Associates*, 389 Ill. App. 3d 795 (2009), the class action lawsuit, based on the transmission of unsolicited fax advertisements, alleged violation of the TCPA, common law conversion of the toner and paper of the class members, and common law trespass to chattels. *Id.* at 796. The parties did not dispute that the receipt of the fax advertisements constituted "property damage" which would be covered by the CGL policy, but the insurer argued that the "expected or intended injury" exclusion in the policy barred coverage for property damage that was "expected or intended from the standpoint of the insured." (Internal quotation marks omitted.) *Id.* at 800. The court concluded that it was possible under the complaint that the insured "was negligent in believing the subject fax advertisements were authorized and did not intend to convert the recipients' paper and toner or dispossess them of their fax machines." *Id.* at 803. Because it was possible that the property damage was an occurrence that was not "expected or intended," the appellate court concluded that the insurer had a duty to defend the insured in the underlying action. In contrast to the BCS professional liability policy, which expressly excludes "injury to or destruction of any property," the parties agreed that the CGL policy at issue in *Shelborne* potentially covered the "property damage" caused by the unwanted faxes.

¶ 44    On remand from the Illinois Supreme Court, the appellate court in *Standard Mutual Insurance Co. v. Lay*, 2014 IL App (4th) 110527-B, considered the insurer's argument that even if there was policy coverage for " 'advertising injury,' " the policy specifically excluded the rendering or failure to render any professional services, including " 'advertising services,' " from coverage; the insured was a real estate agency that sent a "blast fax" advertisement. *Id.* ¶ 27. Citing *Westport*, the court rejected the insurer's argument, stating that "[f]ollowing [the insurer's] argument," *i.e.*, an insured advertising its business is an excluded professional service, "would read the coverage of advertising injuries entirely out of the policies despite the fact such coverage is specifically available under the policies." *Id.* ¶ 28. Citing *Valley Forge*, the court further held that the " 'personal and advertising injury' " policy provision provided coverage given that the policy defined privacy to include the right to seclusion or being left alone, and the faxes were sent without the permission of the recipient, thus violating the recipient's right to privacy. *Id.* ¶ 33. Citing *Shelborne*, the court also rejected the insurer's argument that the insured's actions were not covered because, although the policy provided coverage for " 'injury to tangible property,' " the policy excluded coverage for intentional actions of the insured that injure others. *Id.* ¶ 30. Because the insured "thought it had authorization to send faxes to the particular recipients," the court concluded that the

insured "did not intend to injure anyone by sending the fax." *Id.* ¶ 31. Again, the policy provisions at issue in *Lay* differ significantly from those of the BCS policy. The BCS policy, among other things, does not provide coverage for "personal and advertising injury" or "injury to tangible property," as did the policy in *Lay*. Furthermore, although we recognize the *Lay* court was analyzing whether a "professional services" exclusion precludes coverage–as opposed to whether a professional liability policy provides coverage–we note that the *Lay* court, citing *Westport*, observed that "[t]he claim against Lay was not made because Lay incorrectly performed real estate services," but was instead "based on Lay's tortious conduct ancillary to the performance of real estate services." *Id.* ¶ 28.

¶ 45     As noted above, "it is the actual language of a policy that ultimately controls the determination of what risks are covered." *Westport*, 387 Ill. App. 3d at 412. While Illinois cases have found potential insurance coverage relating to TCPA claims and related claims, the *Westport* policy is most similar to BCS policy at issue. Like the *Westport* court, we conclude that BCS had no duty to defend–and thus no duty to indemnify–Bradford against the claims asserted in Margulis's class action petition.

¶ 46                                    B. Estoppel

¶ 47     Margulis states that "[h]aving erroneously concluded that BCS did not breach its duty to defend, the trial court did not reach the question of the consequences that flow from BCS's breach." Based on the alleged breach of the duty to defend, Margulis contends that BCS is estopped from raising policy defenses and must indemnify the entire underlying judgment of $4,999,999, despite the policy's $1 million limit. BCS counters that it "cannot be estopped when it never had a duty to defend." BCS further asserts that, even if application of the estoppel doctrine was appropriate, an insured may recover an excess judgment based on an insurer's breach of the duty to defend only under limited circumstances, *i.e.*, if the insurer acted in bad faith or, "as a compensatory measure, where the insured's damages are proximately caused by the insurer's breach of duty." In his reply brief, Margulis argues that there are no exceptions to the estoppel doctrine for policy limit provisions.

¶ 48     "Generally, where a complaint against an insured alleges facts within or potentially within the coverage of the insurance policy, and when the insurer takes the position that the policy does not cover the complaint, the insurer must: (1) defend the suit under a reservation of rights; or (2) seek a declaratory judgment that there is no coverage." *Standard Mutual Insurance Co. v. Lay*, 2013 IL 114617, ¶ 19. An insurer that fails to defend under a reservation of rights or to seek a declaratory judgment, and is later found to have wrongfully denied coverage, is estopped from raising policy defenses to coverage. *Employers Insurance of Wausau v. Ehlco Liquidating Trust*, 186 Ill. 2d 127, 150-51 (1999). The estoppel doctrine "arose out of the recognition that an insurer's duty to defend under a liability insurance policy is so fundamental an obligation that a breach of that duty constitutes a repudiation of the contract." *Id.* at 151.

¶ 49     The estoppel doctrine "applies only where an insurer has breached its duty to defend." *Id.* Application of the doctrine "is not appropriate if the insurer had no duty to defend, or if the insurer's duty to defend was not properly triggered." *Id.* These circumstances include "where, when the policy and the complaint are compared, there clearly was no coverage or potential for coverage." *Id.* "Thus, whether estoppel applies necessarily depends on whether the insurer had and breached a duty to defend." *Hunt v. State Farm Mutual Automobile Insurance Co.*, 2013 IL App (1st) 120561, ¶ 17.

- 13 -

¶ 50    We have concluded that BCS had no duty to defend Bradford in the underlying action because the policy at issue could not possibly cover the liability arising out of the facts alleged by Margulis; the terms of the policy clearly preclude the possibility of coverage. See *Illinois Emcasco*, 337 Ill. App. 3d at 360. Because we have concluded that BCS owed no duty to defend, the doctrine of estoppel is inapplicable. *West American Insurance Co. v. Midwest Open MRI, Inc.*, 2013 IL App (1st) 121034, ¶ 27.

¶ 51                                III. CONCLUSION

¶ 52    For the reasons stated herein, we affirm the order of the circuit court of Cook County granting BCS's motion for summary judgment and denying Margulis's motion for summary judgment.

¶ 53    Affirmed.